I, Dustin Poulin, being duly sworn, depose and state as follows:

## INTRODUCTION

1.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since June 2015, and I am currently assigned to FBI's Boston Field Office. I was previously assigned to the FBI Philadelphia Division, South Jersey Violent Offender and Gang Task Force ("SJVOGTF"), in Cherry Hill, New Jersey. As an FBI Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of the federal narcotics laws in Title 21 of the United States Code. Prior to becoming a Special Agent, I served with the FBI since December 2009 as an Operation Support Technician and Staff Operations Specialist in the FBI Boston Division, Boston, Massachusetts. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.  As an FBI Special Agent, I have participated in narcotics investigations and debriefed or participated in the debriefings of defendants, informants, and witnesses who had personal knowledge of narcotics trafficking and gang organizations. I have participated in many aspects of narcotics investigations, including conducting physical and electronic surveillance, analyzing telephone toll information obtained through subpoenas, analyzing information obtained through court-ordered pen registers and trap and trace intercepts, overseeing the activities of and debriefing confidential human sources, and executing arrest and search warrants. I have coordinated controlled purchases of illegal drugs utilizing confidential sources and cooperating witnesses. I have interviewed admitted drug traffickers, drug users, informants, cooperating defendants, and local, state, and federal law enforcement officers regarding the

manner in which drug traffickers distribute, obtain, finance, store, manufacture, transport, and distribute illegal drugs, including heroin and fentanyl.  As such, I am familiar with the methods, routines, and practices of individuals involved in the use, sale, and trafficking of narcotics.  I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver, dispense, import and export, and use controlled substances such as methamphetamine, fentanyl, heroin, cocaine, marijuana, prescription medications, and other controlled substances.  Based on my training and experience, I am familiar with the appearance, packaging, and texture of many controlled substances, including heroin and fentanyl.

3. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information.  I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.  I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

**PURPOSE OF AFFIDAVIT**

4. This affidavit is being submitted in support of an application for a search warrant

for electronic equipment seized from Alan ACOSTA pursuant to his arrest on July 31, 2019: a white and gold iPhone, model A1522, FCC ID BCG-E2817A, IMEI 359320062625842 ("Telephone-1"), which is in the possession of law enforcement officials, as described in Attachment A.

5. As a result and as will be discussed below, I submit that there is probable cause to believe that Telephone-1 contains records and other evidence of the following offenses: (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses"). More specifically, as will be discussed below, I submit that there is probable cause to believe that evidence of the Target Offenses, as set forth in Attachment B, will be located within Telephone-1, as described in Attachment A.

6. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

7. On July 31, 2019, I participated in a controlled narcotics operation in Lawrence, Massachusetts with the assistance of a confidential informant ("CI-1[1]"). All times noted in this

---

[1] CI-1 is an individual who was stopped by law enforcement officers while engaging in a street level drug transaction. . CI-1's primary motivation for cooperating with law enforcement is to avoid state charges associated with the previously mentioned street level drug transaction. CI-

affidavit are approximate. On July 31, 2019, CI-1 communicated via text message on a cellular telephone to telephone number 978-715-5183. Based on my training and experience, and based on conversations with CI-1, I believe telephone number 978-715-5183 was operated by a "dispatcher," who I understand to be an intermediary for different drug dealers. CI-1 contacted telephone number 978-715-5183 and requested five "fingers", or 50 grams, for $1,030. A "finger" is a common street term for 10 grams of heroin and/or fentanyl. The dispatcher agreed to the exchange and instructed CI-1 to go to 27 Dewey Street, Lawrence, Massachusetts.

8. Officers provided CI-1 with $1,030 of pre-recorded official funds. Officer also searched CI-1 and CI-1's vehicle for contraband and money with negative results. Officer then equipped CI-1 with an audio surveillance device for his/her safety before departing and driving to 27 Dewey Street in Lawrence. The audio surveillance was not recorded. Officers audibly and visually surveilled CI-1 while CI-1 travelled to 27 Dewey Street.

9. At 4:05 p.m., law enforcement officers observed a red Kia vehicle occupied by two Hispanic males travel down Dewey Street and slow down next to CI-1's vehicle. The operator, later identified as ACOSTA, looked at CI-1's vehicle and passed it slowly. The Kia drove around the block as if the occupants were conducting counter-surveillance. CI-1 then notified law enforcement officers that the dealer was in a red Kia, the same vehicle law enforcement officers saw circling the area. Law enforcement officers then observed the passenger, later identified as Abigail ARIAS, exit the front passenger seat of the Kia and look up and down the street. Based on my training and experience, I believe ARIAS was conducting counter-surveillance before making the drug transaction. Officers then overheard ARIAS talking

---

1 has one prior arrest in 2015 for a drug related crime. Information received from CI-1 has been corroborated, as detailed herein, and I believe it to be reliable.

to CI-1 on the audio surveillance device. This conversation was in English. ARIAS asked CI-1 if the money was good and CI-1 told ARIAS the money is all there. CI-1 then stated a code phrase to indicate to the officers conducting surveillance that the deal was complete.

10. Once law enforcement officers received confirmation the deal had been completed, officers converged on ARIAS. ARIAS had left CI-1's location and was walking towards Nesmith Street. The Kia had circled the block and headed up Dewey Street past CI-1's location. Based on my training and experience, I believe the Kia circled the block and was returning to pick up ARIAS. As ARIAS approached the Kia, law enforcement officers exited their unmarked police cars, and with identifiers clearly displayed, placed ARIAS in custody. At this time, ACOSTA drove at a high rate of speed down Dewey Street. Law enforcement officers followed and activated their sirens and emergency lights at which time ACOSTA pulled to the side of the road.

11. After ARIAS and ACOSTA were secured, a search was conducted for the pre-recorded official funds, which were located in ARIAS's right front pocket. No other contraband or personal items were located on ARIAS's person. ACOSTA was removed from the Kia and the vehicle was searched for further contraband. Law enforcement officers located approximately two ounces of marijuana in the glovebox. Furthermore, law enforcement officers found a fanny pack that contained a digital scale, a wallet containing $758 US currency, a passport, and a Massachusetts paper ID belonging to ACOSTA. Investigators found and seized Telephone-1 inside of the Kia. ACOSTA and ARIAS were both placed under arrest by the Massachusetts State Police and charged in state court with drug distribution offenses. Those charges are pending.

12. Based on my training and experience, as well as the experience of other law

enforcement officers involved in the arrest, I believe ACOSTA was an active participant in the drug transaction with ARIAS. CI-1 setup the controlled drug deal through a dispatcher who was an intermediary for ARIAS and ACOSTA. ARIAS did not possess a telephone upon his arrest, and ACOSTA was the only one in the Kia where investigators found Telephone-1. Therefore, I believe ACOSTA and ARIAS were dispatched to conduct the drug transaction with CI-1 using Telephone-1.

## LOCATION OF THE EQUIPMENT

13. Telephone-1 is currently in the possession of agents from the FBI Boston Field Office, as described in Attachment A.

## PROBABLE CAUSE TO BELIEVE THAT THE EQUIPMENT CONTAINS EVIDENCE AND INSTRUMENTALITIES OF A CRIME

14. As established above, there is probable cause to believe that ACOSTA used Telephone-1 to participate in and facilitate the Target Offenses.

15. In addition, based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug trafficking frequently use computers and other electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs and drug trafficking. These tasks are frequently accomplished through text messages, encrypted messages, and photographs. Based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity. For example, individuals involved in drug trafficking frequently utilize one phone to communicate with drug customers and another phone to communicate with other drug-related associates (*e.g.*, suppliers, runners, organizers). Individuals involved in drug trafficking frequently change their phones and/or phone numbers, and their utilization of multiple phones can mitigate the disruption associated with these changes

(for example, a dealer can change the phone used to communicate with drug suppliers or organizers while not changing the phone used to communicate with customers, or vice versa).

16. As discussed above, Telephone-1 is currently being stored by investigators at their facilities as described in Attachment A. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that Telephone-1 has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when Telephone-1 was initially seized on July 31, 2019.

17. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Telephone-1 is a smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

18. Based on my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in smartphones such as Telephone-1.

19. Based on my training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers,

they can easily transfer the data from their old computer to their new computer.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media, in particular computers' internal hard drives, contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

20. Based on the information described above, I believe that Telephone-1, as described in Attachment A, contains evidence, and instrumentalities of drug trafficking, as described in Attachment B.

_____
Dustin Poulin
Special Agent
Federal Bureau of Investigation


SIGNED and SWORN to before me on October 16, 2019.


_____
HONORABLE M. PAGE KELLEY
United States Magistrate Judge
District of Massachusetts

ATTACHMENT A

**Description of Equipment to Be Searched**

A white and gold iPhone, model A1522, FCC ID BCG-E2817A, IMEI 359320062625842 ("Telephone-1") seized by law enforcement officers on July 31, 2019. The equipment is located at the FBI Boston Field Office, in secured storage.

## ATTACHMENT B

## Permissible Retrieval Techniques

The government, and anyone whose assistance the government may require, may conduct an off-premises search of Telephone-1 using whatever data analysis techniques appear necessary to locate and retrieve the evidence described herein, even if those techniques renders Telephone-1 inoperable. To the extent Telephone-1 is damaged beyond repair, password protected, locked or otherwise inoperable and traditional data analysis techniques will not work, the government may use a data analysis technique referred to as "chip off." "Chip off" is a process where the BGA (Ball Grid Array or memory chip) chip is removed from a mobile device using heat or an infrared light and the chip itself is then analyzed. This is a destructive process that will render Telephone-1 inoperable, but it may allow for the complete collection of all data stored on the memory chip.

## Items to Be Seized

1. All records, in whatever form, and tangible objects that constitute evidence, or instrumentalities of (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses"); between January 2019 and present, including those related to:

   a) Records of drug trafficking activities;

   b) lists of customers, suppliers, runners, dispatchers and related identifying information;

    c)      any information recording schedule, whereabouts, or travel, including calendar, e-mails, cell tower, location, and GPS data;

    d)      all bank records, checks, credit card bills, account information, and other financial records;

    e)      the identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

    f)      text and multi-media messages.

2. Evidence showing who used or owned Telephone-1, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet in furtherance of the Target Offenses and proving ownership, including:

    a)      records of Internet Protocol addresses used;

    b)      records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    c)      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.